# 25-576

==================================================================

IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

Republican Action for Argentina, Inc.,

*Interested Party - Appellant,*

v.

Petersen Energía Inversora, S.A.U

*Plaintiff - Appellee,*

Argentine Republic

*Defendant - Appellee*

_____

On Appeal from the United States District Court
for the Southern District of New of York

_____

## BRIEF OF INTERESTED-PARTY – APPELLANT
_____

Fernando G. Irazu
President and Counsel
*Republican Action for Argentina, Inc.*
Billinghurst 1656, 2 A
Buenos Aires, 1425
Argentina
+54 11 4824-1067
fgirazu@gmail.com

*Interested-Party – Appellant*

==================================================================

## CORPORATE DISCLOSURE STATEMENT

Pursuant to FRAP, Rule 26.1, the undersigned counsel for Republican Action for Argentina Inc. states as follows:

Republican Action for Argentina is a non-governmental charitable organization established under the laws of the United States of America with a tax-exempt status under Section 501(c)(3).  Nobody holds directly or indirectly any ownership interest in it, and none of its founders and directors have any political affiliation or exposure in the United States of America, the Republic of Argentina, or any other country around the world.

Its corporate purpose is geared at *"strengthening [Argentina's] republican institutions with democratic participation, with the goal of fostering judicial independence and integrity in public office, while also advocating for personal rights and free-market economy.",* Certificate of Incorporation (stamped) of Republican Action for Argentina, Inc.

The professional services of the undersigned are *pro bono,* in furtherance of the rights and interests of the Argentinean people as well as the national and strategic interests of the United States of America.

**TABLE OF CONTENTS**

**Page**

Corporate Disclosure Statement………………………………………………………2

Table of Authorities……………………………………………………………………...3

  Cases…………………………………………………………………………...5

  Statutes, Acts and Rules…………………………………………………….....8

  Doctrine……………………………………………………………………...9

Preliminary Statement……………………………………………………………..11

Jurisdictional Statement……………………………………………………………...14

Statement of Issues…………………………………………………………………..15

Statement of the Case………………………………………………………………..15

Summary of the Argument…………………………………………………………..26

Argument and Standard of Review……………………………………………….30

  **Issue I**: Interested-Party Intervention…………………………………..30

Did the District Court apply the correct caselaw, *in re*, *D'Amato v. Deutsche Bank,* 236 F.3d 78, 84 (2d Cir. 2001) and *Restor-A-Dent Dental Lab'ys, Inc. v. Certified Alloy Prods., Inc.*, 725 F.2d 871, 874 (2d Cir. 1984), to deny the intervention as of right and permissive requested by RA4ARG (interested-party) per Rule 24(a)(b) as untimely and with no direct, cognizable interest?

  a. Legal standing, unique role and advocacy…………………………....30

  b. Factual background and timing……………………………………....33

  c. Direct, concrete and cognizable interest…………………………..37

  d. Intervention as of right………………………………………………38

  e. Permissive intervention.……………………………………………40

**Page**

**Issue II:** Rule 60 Relief……………………………………………...…42

Should this Court remand the core final judgment of the District Court dated 9/15/2023 per Rule 62.1(A)(3)(B)(C), in tandem with caselaw invoked by the District Court, *in re, Toliver v. Cnty. of Sullivan,* 957 F.2d 47, 49 (2d Cir. 1992), insofar RA4ARG's encompassing request for relief per Rule 60(b)(4)(6) and (d)(1)—(3)?

  a. Timely request, unprecedented setting and extraordinary remedy………43

  b. Rule 60(b)(4): "Judgment void" for lack of jurisdiction, new applicable law……….…………………………………………………45

  c. Rule 60(b)(6): "Any other reason" that justifies vacatur……………….50

  d. Rule 60(d)(1)—(3): Judgment set aside due to "Fraud on the Court"…57

  e. Final considerations……………………………………………………67

Conclusion ……………………………………………………………..68

Addendum………………………………………………………………...70

Certification…………………………………………………………….…73

Certificate of Service…...………………………………..…………….…..74

# TABLE OF AUTHORITIES

**Cases** **Page**

*Alix v. McKinsey & Co., Inc.*, No. 20-2548 (2d Cir. 2022)……………….....38, 63

*Aoude v. Mobil Oil Corp.*, 892 F.2d 1115, 1118 (1st Cir. 1989)…………....……..59

*Balentine v. Thaler*, 626 F.3d 842, 846 (5th Cir. 2010), *cert. denied*, 564 U.S. 1006 (2011) (quoting *Batts v. Tow-Motor Forklife Co.*, 66 F.3d 743, 747 (5th Cir. 1995))……………………………………………………………………………...51

*Ben Sager Chems. Int'l, Inc. v. E. Targosz & Co.*, 560 F.2d 805, 812 (7th Cir. 1977)…………………………………………………………………………....57

*Binker v. Com. of Pa.*, 977 F.2d 738, 745 (3d Cir. 1992)…………………………32

*Brooks v. Flagg Bros.*, Inc., 63 F.R.D. 409, 414–15 (S.D.N.Y. 1974)……………33

*Builders Ass'n of Greater Chicago v. City of Chicago,* 170 F.R.D. 435, 440–41 (N.D. Ill. 1996)…… …………………………………………………………...39

*Chafin v. Chafin,* 133 S. Ct. 1017, 185 (2013)……………………………………63

*Citibank, N.A. v. Aralpa Holdings Limited Partnership et al*, No. 1:2022cv08842 - Document 116 (S.D.N.Y. 2024); Docket No. 24-423-cv, United States Court of Appeals, Second Circuit (January 24, 2025)……………………………………...65

*City of Chicago v. FEMA*, 660 F.3d 980, 987 (7th Cir. 2011)…………………....42

*Coalition of Arizona/New Mexico Counties for Stable Econ. Growth v. Dep't of Interior,* 100 F.3d 837, 845 (10th Cir. 1996)………………………………………40

*Coleman v. Cty. of Suffolk*, 174 F. Supp. 3d 747, 754 (E.D.N.Y. 2016), aff'd, 685 Fed. App'x 69 (2d Cir. 2017)………………..…………………………….………42

*Commack Self-Serv. Kosher Meats, Inc. v. Hooker*, 680 F.3d 194, 203 (2nd Cir. 2012)……………………………………………………………………………30

*Commonwealth of Pennsylvania v. President of the United States*, 888 F.3d 52 (3d Cir. 2018) (Little Sisters of the Poor)……………………………………………..40

**Cases** *(cont.)*                                                        **Page**

*Consejo de Defensa del Estado de la República de Chile v. Banco Santander Central Hispano, S.A.*, No. 09-20621, 2009 WL 2336429 (S.D. Fla. May 29, 2009)…………………………………………………………………………..54

*Consejo de Defensa del Estado de la República de Chile v. Banco de Chile*, No. 109CV20614, 2009 WL 1612255 (S.D. Fla. Mar. 11, 2009)……………………..54

*D'Amato v. Deutsche Bank,* 236 F.3d 78, 84 (2d Cir. 2001)…………………*passim*

*Feller v. Brock*, 802 F.2d 722, 729 (4th Cir. 1986)…………………………………….33

*Federal Republic of Germany v. Philipp*, 592 U.S. ___ (2021)……..………27, 56, 67

*Good Luck Nursing Home, Inc. v. Harris*, 636 F.2d 572, 577 (D.C. Cir. 1980)….51

*Grace v. Bank Leumi Tr. Co. of NY*, 443 F.3d 180, 188 (2d Cir. 2006)………..…32

*Gschwind v. Cessna Aircraft Co.*, 232 F.3d 1347 (10th Cir. 2000)…………........57

*Hussein v. Maait*, No. 22-1506 (2d Cir. 2025)………………..……...16, 18, 47, 48

*Irving. H. Picard, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC*,  917 F. 3d 85 (CA2 2019)……………………………………….65

*Jordan v. U.S. Dep't of Lab.*, 331 F.R.D. 444, 451 (D.D.C. 2019), *aff'd*, No. 19-5201, 2020 WL 283003 (D.C. Cir. Jan. 16, 2020)……………………..………59

*Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 385 (7th Cir. 2008)………………………………………………………...........32

*Klapprott v. United States*, 335 U.S. 601 (1949)……………………………………45

*Kleissler v. United States Forest Service*, 157 F.3d 964, 972 (3d Cir. 1998)……..39

*Kootenai Tribe of Idaho v. Veneman*, 313 F.3d 1111 (9th Cir. 2002)…………….42

*Luxepress 2016 Corp. v. Government of Ukraine*, No. 18-V-812, 2020 WL 1308357 at *3 (D.D.C. Mar. 19, 2020)……………………………………………56

*Marco Destin, Inc. v. Levy*, No. 23-1330 (2d Cir. Aug. 8, 2024)……………..43, 63

**Cases** *(cont.)* **Page**

*Oneida Indian Nation of Wis. v. New York*, 732 F.2d 261, 265-66 (2d Cir. 1984)……………………………………………………………………………38

*Page v. Schweiker*, 786 F.2d 150, 159–60 (3d Cir. 1986) (Garth, J., concurring)…………………………………………………………………..57

*Passalacqua Builders, Inc. v. Resnick Devs. S., Inc.*, 933 F.2d 131 (2d Cir. 1991)…………………………………………………………………..65

*People for the Ethical Treatment of Animals v. U.S. Dep't of Health & Hum. Servs.*, 901 F.3d 343, 355 (D.C. Cir. 2018) (quoting *Comput. Pros. for Soc. Resp. v. U.S. Secret Serv.*, 72 F.3d 897, 903 (D.C. Cir. 1996))……………………….51

*Petersen Energía Inversora v. Argentine Republic and YPF*, United States Court of Appeals, Second Circuit, Docket Nos. 16-3303-cv(L), 16-3304-cv(Con) (July 10, 2018)………………………………………………...…………………...46, 48

*Republic of Austria v. Altmann*, 541 U. S. 677 (2004)……………………………62

*Republic of Haiti v. Aristide*, No. 05-22852, 2005 WL 3521251 (S.D. Fla. Nov. 2, 2005)…………………………………………………………………..…54

*Republic of Iran v. Pahlavi*, 464 N.Y.S.2d 487 (N.Y. App. Div. 1983)………….54

*Republic of Panama v. BCCI Holdings*, 119 F.3d 935 (11th Cir. 1997)………….55

*Republic of the Philippines v. Marcos*, 818 F.2d 1473, 1480–81 (9th Cir. 1987) rehearing *en banc*, 862 F.2d 1355, 1360–61 (9th Cir. 1988) (*en banc*)………..…55

*Restor-A-Dent Dental Lab'ys, Inc. v. Certified Alloy Prods., Inc.*, 725 F.2d 871, 874 (2d Cir. 1984)……………………………………………………………*passim*

*RJR Nabisco, Inc. v. European Community*, 136 S. Ct. 2090 (2016)………….…36

*Robinson v. Audi Aktiengesellschaft*, 56 F.3d 1259, 1266 (10th Cir. 1995)………59

*Southerland v. Irons*, 628 F.2d 978, 980 (6th Cir. 1980) (*per curiam*)…………...32

*Steves & Sons, Inc. v. Jeld-Wen, Inc.*, 323 F.R.D. 553, 561 (E.D. Va. 2018)…….41

*Stuart v. Huff*, 706 F.3d 345, 352 (4th Cir. 2013)………………………………...40

**Cases** *(cont.)* **Page**

*Sweeney, Cohn, Stahl & Vaccaro v. Kane*, 773 N.Y.S.2d 420 (2d Dep't 2004)………………………………………………………………………..65

*Tani,* 282 F.3d at 1168 (*citing Martella v. Marine Cooks & Stewards Union*, 448 F.2d 729, 730 (9th Cir. 1971)…………………………………………..45

*Teague v. Bakker*, 931 F.2d 259, 261 (4th Cir. 1991)………………………....40

*Thompson v. United States*, 604 U.S. _____ (2025)……………………….……61

*Toliver v. Cnty. of Sullivan,* 957 F.2d 47, 49 (2d Cir. 1992)…………………*passim*

*Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538 n.10 (1972)……….40

*United Guaranty Residential Ins. Co. v. Philadelphia Sav. Fund Soc'y*, 819 F.2d 473, 475 (4th Cir. 1987)………………………………………………………..39

*United States v. Alpine Land & Reservoir Co.*, 984 F.2d 1047, 1049 (9th Cir.1993)……………...…………………………………………………………........44

*United States v. Antonius*, No. 21-1083, 7-10-2023 (2d. Cir. 2023)……………...57

*United States v. Hooker Chems. & Plastics Corp.,* 749 F.2d 968, 983 (2d Cir. 1984)…………………………………………………………….……39

*United States v. Local 683, Enterprise Ass'n*, 347 F. Supp 164, 166 (S.D.N.Y. 1972)………………………………………………………………………41

*United States v. Napout*, No. 18-2750 (2d Cir. 2020)……………………………53

*United States Postal Service v. Brennan*, 579 F.2d 188, 192 (2d Cir. 1978)……..41

*United Student Aid Funds, Inc. v. Espinosa*, 130 S. Ct. 1373, 1374 (2010).….47, 50

*Washington Elec. Coop. v. Massachusetts Mun. Wholesale Elec. Co.*, 922 F.2d 92, 97 (2d Cir. 1990)……………………………………………………………39

*Yang v. Kellner*, 2020 WL 2115412, at *1 (S.D.N.Y. May 3, 2020) (quoting *Olin Corp. v. Lamorak Ins. Co.*, 325 F.R.D. 85, 87 (S.D.N.Y. 2018))…………………39

**Statutes, Acts and Rules**

28 U.S.C. § 1330(a)……………………………………………..………11, 14

**Statutes, Acts and Rules** *(cont.)* **Page**

28 U.S.C. § 1291……………………………………………………………….14

28 U.S.C. §§ 1602 to 1611………………………………………………………..46

28 U.S.C. § 1605(a)(3))………………………………………………………..56

*Foreign Sovereign Immunities Act* (FSIA)…………………………………..*passim*

*Foreign Corrupt Practices Act* (FCPA)…………..…………………………...52, 53

*Racketeer Influenced and Corrupt Organizations Act* (RICO)…………...36, 54, 61

Fed. R. Civ. P., Rule 24……………..………………….………….………*passim*

Fed. R. Civ. P., Rule 60………………………….…………..……...…*passim*

Fed. R. Civ. P., Rule 62.1……………………………………………*passim*

Fed. R. App. P., Rule 12.1…………………………..………………..…*passim*

Fed. R. App. P., Rule 26.1……………………………………………………….2

Fed. R. Civ. P., Rule 5……………………………………………………………16

Local Civil Rule 6.1(d).…………………………………………..………...16, 20

*Doctrine*

Arbastkaya, Maria, Mialon, Hugo, "The Impact of Foreign Corrupt Practices Act on Competitiveness, Bribery, and Investment", *22(1) American Law and Economics Association*, April 2020, 105-126……………….…..…………………..52

Bleimaier, John Kuhn, "The Doctrine of Comity In Private International Law", *24 The Catholic Lawyer 4, 5*, Autumn 1979, 327-332…………………….…..57

**Doctrine** *(cont.)* **Page**

Buxbaum, Hannah L., "Foreign Governments as Plaintiffs in U.S. Courts and the Case Against "Judicial Imperialism", *73 Washington and Lee Law Review 653*, 2016, 688-692.……………………………………………………………….…54

Fox, Hazel; Webb, Phillipa, *The Law of State Immunity*, 430-1 (3rd. ed, 2015) …………………………………………………………………………………….56

Garner, Amy M., "An Attempt to Intervene in the Confusion: Standing Requirements for Rule 24 Intervenors", *69 University of Chicago Law Review 681*, 2002, 703……………………………………….……………………………..…41

Gupta, S., Davoodi, H. & Alonso-Terme, R., "Does corruption affect income inequality and poverty?". *Econ Gov* 3 (2002), 23–45……………………………66

Kennedy, John E, "Let's All Join In: Intervention Under Federal Rule 24", *57 Kentucky Law Journal 3*, Art. 2, 1969, 329-381…………………………............39

Ludovici, Stephen E., "Rule 60(b)(4): When the Courts of Limited Jurisdiction Yield to Finality", *66 Fla. L. Rev. 881* (2015)……………………………………….64

Meadows, Christopher G., "Rule 60(b)(6): Whether "Tapping the Gran Reservoir of Equitable Power" Is Appropriate to Right An Attorney's Wrong", *88 Marquette Law Review*, 2005, 997-1011……………………………………………………..…59

Notes, "Federal Rule 60(b): Relief From Civil Judgments", *61 The Yale Law Journal 1952*, 77-81-84…………................................................................45

Restatement (Fourth) of Foreign Relations Law § 455, Reporter's Note 15, at 374 (2018)………………………………………………………………………………...55

\*\*\*

## PRELIMINARY STATEMENT

Last 4/8/2015 the Plaintiffs sued the Defendants for breach of contract and other alleged grievances deriving from the expropriation process of YPF SA by the Argentine State; arguing the Plaintiffs' minority participation in such entity should have been subject to a tender offer by the Republic of Argentina after the expropriation of the 51% stake held by Repsol SA from Spain (D.Ct.Dkt. 1-3).

The District Court claimed jurisdiction in the underlying legal proceedings due to exceptions –commercial activity and expropriation– to foreign sovereign immunity under the *Foreign Sovereign Immunities Act* ("FSIA"), 28 U.S.C. § 1330(a), as well as various forum *non conveniens* grounds, among others.

All of those grounds are contested herein as a result of new substantive issues raised by Republican Action for Argentina, Inc. ("RA4ARG") pursuant to Rule 60(b)(4)(6) and (d)(1)—(3), including the imperious need for a criminal investigation by the Department of Justice (DOJ) and relevant agencies of the underlying facts and some of the parties involved in these legal proceedings. The Republic of Argentina consented on record twice to RA4ARG's request for such criminal investigation, and committed itself to cooperate with the US government in the endeavor (App. G at A-198, A-201).

As a whole, RA4ARG argues the District Court has no jurisdiction to entertain the Plaintiffs' claims, thus timely pleading under Rule 60 for the vacatur

of the $16.1 billion award plus against the Republic of Argentina and in favor of the Plaintiffs dated 9/15/2023, as well as all prior interconnected rulings (App. B at A-87). Such a final award was previously appealed and cross-appealed by the parties (Dkts. 23-7320, 23-7376, 23-7463, 23-7614, 23-7471, 23-7667).

RA4ARG's new arguments in no way, shape or form overlap, replace, and/or superpose with those argued by the Defendants within the ordinary appeal process. RA4ARG also timely claimed intervention in the underlying proceedings as of right and permissive under Rule 24(a)(b), which was denied by the District Court (App. C at A-92).

In short, RA4ARG argues this case is tainted by "color" of State-related corruption at the core and from inception; and alleged criminal activity can never be conceptualized as a legitimate commercial activity and/or a legitimate *domestic taking* process, which could comform exceptions to the Republic of Argentina's sovereign immunity under FSIA. Therefore, the District Court's final ruling is void for lack of jurisdiction.

Based on the factual background of this case, RA4ARG at the same time claims that a legal precedent of this nature would potentially attract to US courts, as a magnet, corrupt individuals and/or entities via agents, brokers and/or intermediaries or not –within this setting, Burford Capital Ltd. would fall in the

12

latter category–, eager to recoup the exploits of their foreign corrupt criminal schemes.

All of the prior is clearly against the national and strategic interests of the United States of America as well as the rights and interests of all Argentinean citizens –minus those related to the Plaintiffs. RA4ARG argues there is a category or class of undesired cases around the world the US legal system should not embark on at all, if it were not to punish such sort of corruption and criminal behavior while attempting to further consummate it within US courts.

The District Court claimed lack of jurisdiction to entertain RA4ARG's substantive relief per Rule 60 due to the ongoing ordinary appeal and cross-appeal process against its final judgment by the parties. To that effect, the District Court invoked specific caselaw indicating that *"this [appellate] court must first give its consent so it can remand the case"*, in re, *Toliver v. Cnty of Sullivan*, 957, F.2d 47, 49 (2nd Circ. 1992) (App. C at A-92; App. D at A-96).

RA4ARG timely appealed the District Court's ruling of 3/3/2025 denying its intervention as an interested party both as of right and permissive per Rule 24(a)(b); and it complied with the prescribed process before this Court in light of the new substantive issues under Rule 60 and the specific terms of such same ruling under Rule 62.1 (A)(3) (B)(C), FRAP, Rule 12.1 (App. A at A-5; App. F at A-189, A-196).

13

As further detailed below, the aforesaid allegations of foreign government-related corruption tainting the Plaintiffs' standing and claims refer back to and are supported by ongoing criminal proceedings acknowledged by the Republic of Argentina (App. G at A-198, A-201), including others recently initiated both in Argentina and Europe (App. J at A-216; App. K at A-223); evidence submitted on record (App. L at A-239); sanctions imposed on key former Argentine officials by the US government due to significant corruption (App. H at A-207); as well as the comfort provided by President Javier Milei on record to fight any of such present and historical corruption under US jurisdiction jointly with the US government (App. G at A-198, A-201); among others.

## JURISDICTIONAL STATEMENT

As indicated, the District Court asserted jurisdiction over the underlying case pursuant to 28 U.S.C. § 1330(a). The District Court denied RA4ARG's requested intervention per Rule 24(a)(b), and, once again, it claimed no jurisdiction to rule on the vacatur of its final judgment dated 9/15/2023 due to the ongoing ordinary appeal process, *in re*, *Toliver v. Cnty. of Sullivan*, 957 F.2d 47, 49 (2d Cir. 1992).

This Court has standard appellate jurisdiction pursuant to 28 U.S.C. § 1291 to rule on RA4ARG's requested relief per Rule 24(a)(b) and Rule 60(b)(4)(6) and (d)(1)—(3), and to remand the case accordingly per Rule 62.1(A)(3)(B)(C), FRAP, Rule 12.1.

14

As also mentioned, RA4ARG timely appealed the District Court ruling of 3/3/2025 (App. A at A-5), and without delay complied with the prescribed proceeding per Rule 62.1 (A)(3)(B)(C), FRAP, Rule 12.1 (App. F at A-186, A-196).

## STATEMENT OF THE ISSUES

**(i)**     Did the District Court apply the correct caselaw, *in re*, *D'Amato v. Deutsche Bank,* 236 F.3d 78, 84 (2d Cir. 2001) and *Restor-A-Dent Dental Lab'ys, Inc. v. Certified Alloy Prods., Inc*., 725 F.2d 871, 874 (2d Cir. 1984), to deny the intervention as of right and permissive requested by RA4ARG (interested-party) per Rule 24(a)(b) as untimely and with no direct, cognizable interest?

**(ii)**     Should this Court remand the core final judgment of the District Court dated 9/15/2023 per Rule 62.1(A)(3)(B)(C), in tandem with caselaw invoked by the District Court, *in re, Toliver v. Cnty. of Sullivan,* 957 F.2d 47, 49 (2d Cir. 1992), insofar RA4ARG's encompassing request for relief per Rule 60(b)(4)(6) and (d)(1)—(3)?

## STATEMENT OF THE CASE

Last 2/17/2025, RA4ARG timely filed with the District Court (Honorable Loretta A. Preska) an *ex parte* standard explanatory letter, a motion to intervene

15

per Rule 24(a)(b) and a motion to vacate final judgment per Rule 60(b)(6) [any other reason that justifies vacatur] and (d)(1)—(3) [fraud on the Court], with their pertinent memoranda of law and critical exhibits,[1] all in accordance with applicable law (Rule 5(a)(1)(D), Local Civil Rule 6.1(d)) (App. E at A-100 – A- 134).

Last 2/19/2025, the District Court *sua sponte* uploaded RA4ARG's filings to the PACER system, and asked the parties to render their opinions no later than 2/25/2025 (App. E at A-100 – A-134).

Last 2/19/2025, new applicable law to this case was released by this Court, *in re*, *Hussein v. Maait*, No. 22-1506 (2d Cir. 2025), relevant in the context of Rule 60(b)(4) [judgment void due to lack of jurisdiction]. Technical grounds forbid any petitioner of relief under Rule 60 to duplicate the grounds already pursued via the ordinary appeal process. This is evidently not the case under any and all scenarios

---

[1] Last 2/17/2025, RA4ARG submitted all criminal complaints from former Congresswoman Ms. Elisa M. A. Carrió in Argentina, Docket No. 3518/2006, "*NN /about criminal investigation*", Federal Criminal and Correctional Court No. 4, during 2006, 2012 (amended and expanded), and 2023 (amended and expanded as a result of the District Court's $16.1 billion award against the Republic of Argentina), as well as the Confidential Intelligence Report No. 0704/18 issued by the Argentinean Financial Information Unit (UIF), *in re*, "*NN/ violation of Law 22,415*", Federal Criminal and Correctional Court No. 4, Buenos Aires, Argentina, as probatory indication of criminal activity regarding the Eskenazi Family's acquisition of a 25% stake in YPF from Repsol and related maneuvers, among others. [free open source] https://www.rionegro.com.ar/wp-content/uploads/2023/04/54434.pdf. Ex.1-2 to Republican Action for Argentina, Inc.'s Memorandum of Law in Support of *Ex-Parte* Motion for Order Pursuant to Fed. R. Civ. P., Rule 60(b)(6), (d)(1)—(3), 2/17/2025, not uploaded to the PACER system by the District Court (D.Ct.Dkt. 720; Dkt. 36, Ex. 7).

that contemplate RA4ARG's substantive issues, and new applicable law that also gave room to argue the jurisdictional issue *per se* (Rule 60(b)(4)) and not merely in tandem with the grounds previously raised by this party (Rule 60(b)(6), (d)(1)—(3)) (App. E at A-100 – A-166).

Last 1/2025, some Burford Capital Ltd.'s Argentine operator visited the country to somehow explore a *debt-to-equity-swap* with the Argentine government as a result of the $16.1 billion plus award to the Plaintiffs –presumably, YPF's energy assets.[2]

Last 2/25/2025, the parties filed their responses to RA4ARG's filings before the District Court.  As anticipated, the Plaintiffs –Petersen Energía Inversora S.A.U. et al.– opposed RA4ARG's intervention and requested relief (D.Ct.Dkt. 722).  However, such was not the case with the Argentine government after hearing the claims from the Argentinean population itself via the press and social media (D.Ct.Dkt. 723; App. G at A-198).  In fact, the Republic of Argentina has taken the following positions:

---

[2] Press articles and interview: https://batimes.com.ar/news/economy/burford-met-with-silence-from-milei-over-us16-billion-ypf-judgment.phtml; https://www.infobae.com/america/agencias/2025/03/21/argentina-le-hace-la-ley-del-hielo-a-fondos-a-los-que-debe-us16100-millones/; https://www.infobae.com/economia/2025/01/09/ypf-burford-se-entusiasma-con-el-boom-financiero-local-y-quiere-cobrar-este-ano-un-juicio-que-ya-supero-los-usd-17000-millones/

- Unopposed RA4ARG's intervention in these legal proceedings;

- Stated that RA4ARG has no connectivity, interaction and/or relationship with the Republic of Argentina –and/or any other party, for clarification purposes–;

- Vouched for a criminal investigation under US law and jurisdiction of the facts and parties as requested by RA4ARG in its own request to the District Court; and

- Committed itself to render full cooperation in such an endeavor while preserving its legal views on jurisdictional matters and the overall case.

- Acknowledged ongoing criminal proceedings engulfing some of the parties to this legal conflict in Argentina in connection with the Eskenazi (Petersen Group) and Kirchner Families' dealings at YPF, clearly identified by RA4ARG in its fillings, along with exhibits documenting some core criminal complaints and evidence produced by the *Argentinean Financial Information Unit* (UIF) (D.Ct.Dkt. 723, 720).

    Any allegations made by RA4ARG are already documented in these proceedings via filings and probatory elements within and outside Argentinean federal courts.[3]

In tandem with the explanation *supra*, last 2/28/2025 RA4ARG amended its

*Motion for Order* pursuant to Rule 60(b)(6), (d)(1)—(3), in order to also include

grounds pursuant to Rule 60(b)(4) due to new applicable law, *in re, Hussein v.*

*Maait*, No. 22-1506 (2d Cir. 2025) (App. E at A-166).

RA4ARG's request for relief included the following:

---

[3] Idem 1.

- RA4ARG's intervention as of right as well as permissive in these proceedings per Rule 24(a)(b).

- A Court-ordered criminal investigation by the Department of Justice (DOJ) and other relevant agencies of the events and individuals detailed in its filings.

- The necessary stay of these legal proceedings until eventual indictments and prosecution take place.

- The vacatur of the core judgment of 9/15/2023 (and any other interconnected ones) awarding $16.1 billion to the Plaintiffs against the Republic of Argentina per Rule 60(b)(4)(6) and (d)(1)—(3).

Last 3/3/2025, the District Court (Honorable Loretta A. Preska) issued final judgment in connection with RA4ARG's filings; confirmed its filings were correctly produced as *ex parte*; denied its request for intervention per Rule 24(a)(b) for untimely and with no cognizable direct interest; and refused to entertain RA4ARG's substantive relief encompassing Rule 60(b)(4)(6) and (d)(1)—(3) due to its alleged lack of jurisdiction, as a result of the ongoing ordinary appeal process before this Court against the District Court's core final judgment of 9/15/2023 that awarded $16.1 billion to the Plaintiffs against the Republic of Argentina (App. C at A-92).

Considering that RA4ARG had also made proper reference to Rule 62.1 via motion for order pursuant to Rule 60,[4] this Court should note the District Court did

---

[4] *"RA4ARG pleads the Court to defer judgment on this motion until its intervention has been ruled upon per its ex-parte motion to intervene of today's date (Fed. R.*

not specifically defer or deny its request for relief per motions under Rule 60 (Rule

62.1(A)(1)(2)).  As previously highlighted, the District Court *sua sponte* framed its

ruling under specific caselaw that contemplates a communication or request for

authorization to the Circuit Court in light of Rule 60(b) (FRAP, Rule 12.1) as well

as the need for the latter to give its consent to remand the case (Rule

62.1(A)(3)(B)(C)) as follows:

> "Even if the Court granted RA4ARG's motion to intervene, the Court lacks
> jurisdiction to grant the relief that RA4ARG seeks due to the pending
> appeal.  *Toliver v. Cnty of Sullivan*, 957, F.2d 47, 49 (2nd Circ. 1992)
> *("[T]he district court may grant a Rule 60(b) motion after an appeal is
> taken only if the moving party obtains permission from the circuit court.")*.",
> Honorable Judge Loretta A. Preska, 3/3/2025 (D.Ct.Dkt. 726; App. C at
> A-92; App. D at A-96).

Based on the substantive new issues raised by RA4ARG under Rule 60 and

the specific ruling of the District Court insofar *"this [appellate] court must first*

*give its consent so it can remand the case"*, in re, *Toliver v. Cnty of Sullivan*, 957,

F.2d 47, 49 (2nd Circ. 1992), RA4ARG requested permission from this Court upon

the above-quoted normative to remand and order the District Court to grant the

relief timely requested, in particular the vacatur of such core judgment of

---

*Civ. P., Rule 24, **Rule 62.1**, Local Civil Rule 6.1.d) (emphasis added)"*,
Republican Action for Argentina, Inc.'s Memorandum of Law in Support of *Ex-Parte* Motion for Order Pursuant to Fed. R. Civ. P., Rule 60(b)(6), (d)(1)—(3),
2/17/2025 (D.Ct.Dkt. 720).

9/15/2023 per Rule 60(b)(4)(6) and (d)(1)—(3) (App. C at A-92; App. D at A-96; App. F at A-189 – A-196; Dkt. 17, 36).

Indeed, the District Court *sua sponte* placed its ruling under Rule 62.1, in the sense it chose not to merely defer or deny RA4ARG's motion under Rule 60 (Rule 62.1(A)(1)(2)), and it did so by quoting specific caselaw as to the need of: **(i)** communicating the situation to the Circuit Court; and **(ii)** remanding the District Court's own rulings under Rule 62.1(A)(3)(B)(C), FRAP, Rule 12.1.

Although the caselaw invoked by the District Court in its ruling, *in re*, *Toliver v. Cnty of Sullivan,* 957, F.2d 47, 49 (2nd Circ. 1992) deals with some dispute about legal fees and the undersigned is acting *pro bono* in this case for the exclusive benefit of all Argentinean citizens and the national and strategic interests of the United States of America,[5] the appellant in such a case did get the relief sought after upon those specific formal terms already fulfilled by RA4ARG herein, with the expectation this Court will rule in line with its pleadings.

Last 3/10/2025, RA4ARG timely appealed the District Court's ruling of 3/3/2025 (D.Ct.Dkt. 728; App. A) and produced all preliminary appellate

---

[5] Please note some public declarations of individuals related to Burford Capital Ltd. could have placed the amount of legal fees from party counsel in the range of $100 million per year.  Idem 2.

documentation, including the one required under Rule 62.1 and FRAP, Rule 12.1

(Dkt. 17; App. F at A-189 – A-196).

Last 3/21/2025, the Secretary of State, Mr. Marco Rubio, announced:

"the designation of Cristina Elisabet Fernandez de Kirchner ("CFK"), former president of Argentina, and Julio Miguel De Vido ("De Vido"), former Minister of Planning of Argentina, for their involvement in significant corruption during their time in public office. This action renders CFK, De Vido, and their immediate family members generally ineligible for entry into the United States. CFK and De Vido abused their positions by orchestrating and financially benefitting from multiple bribery schemes involving public works contracts, resulting in millions of dollars stolen from the Argentine government. Multiple courts have convicted CFK and De Vido for corruption, undermining the Argentine people's and investors' confidence in Argentina's future. The United States will continue to promote accountability for those who abuse public power for personal gain. These designations reaffirm our commitment to counter global corruption, including at the highest levels of government. *These public designations are made under Section 7031(c) of the Department of State, Foreign Operations, and Related Programs Appropriations Act, 2024 (Div. F, P.L. 118-47)."* (Dkt. 36, Ex. 6; App. H at A-207).[6]

Last 3/21/2025, Burford Capital Ltd.'s Lead Counsel, Mr. Gregory J. Joseph

as well as Mrs. Rachel Mead Cherington, withdrew from this case before the

---

[6] Please note that former President Cristina F. de Kirchner was convicted to 6 years in prison and not to hold public office ever again for public-driven corruption schemes –under review by the local Supreme Court of Justice– similar to the ones squabbled in this case. One of those who shared her same fate is an individual by the name of Lázaro Báez, who acted as the Kirchner Family's figurehead and became a "tycoon" of public infrastructure projects after being an employee for many years at *Banco de la Provincia de Santa Cruz*, an institution "privatized" by then Governor Néstor Kirchner and awarded to the Eskenazi Family in their home province. As a clear pattern, in all public-corruption scandals engulfing the Kirchner Family, with or without a criminal conviction, there has always been a figurehead, associate and/or partner caring for their financial "interests".

22

District Court (D.Ct.Dkt. 729-732). Last 3/27/2025, Petersen's Lead Counsel, Mr. Randy M. Mastro, also withdrew from this case before the District Court (D.Ct.Dkt. 733-735).

Last 4/1/2025, the *Financial Times* published an article criticizing the District Court's $16.1 billion judgment against the Republic of Argentina, incorporating some of the arguments posed by RA4ARG, yet with a temperament towards Judge Loretta A. Preska this party does not share or favor (App. I at A-207).

Last 4/7/2025, Argentinean Senator Francesco Paoltroni, with legal representation from Mr. Alberto Garay –current President of the Bar of the City of Buenos Aires– and Ms. María Eugenia Talerico –former Vice Chair of the *Republic of Argentina's Financial Information Unit* during the presidency of Mr. Mauricio Macri–, filed a criminal complaint against local Federal Judge Ariel Lijo –recently voted down by the Senate regarding his nomination to the Argentine Supreme Court of Justice– for criminal activity that resulted in an alleged fraud on the Court in these very same legal proceedings (Dkt. 36, Ex. 5; App. J at A-216).

On or about 3/26/2025, Argentinean Congresswoman Marcela Campagnoli filed a criminal complaint against all relevant members of the Eskenazi Family and the entities of the so-called Petersen Group for money laundering and ancillary in Spain, as well as before the Prosecutor's Office of the European Union (Docket

No. PP00927_2025_ES), which is extensive to these legal proceedings as fraud on the Court (Dkt. 36, Ex. 6; App. K at A-223).

The aforesaid criminal complaints refer back to various evidence, in particular the *Republic of Argentina's Financial Information Unit's Intelligence Report* No. 0704/18 (D.Ct.Dkt. 720, Ex. 2; Dkt. 36, Ex. 7; App. L at A-239),[7] highlighting the alleged corrupt dealings of the Eskenazi and Kirchner Families at YPF SA, among others, with the following listed final purpose:

> "Ultimately, [this report] analyzes the PETERSEN Group's exit by giving up their holdings [at YPF], the impact of the expropriation process of REPSOL YPF SA by the Argentine State, and finally a maneuver by which they attempt to collect some compensation (through the investment fund BURFORD CAPITAL) due to the State-expropriation that could result in additional income to the perpetrators of such maneuvers [before US Courts in the United States of America]."

In sum, such evidence on record points out to the following facts and their immediate implications, as well as overall irregularities "tainting" with government-related corruption the Plaintiffs' claims of private law nature against the Defendants; namely:

1) The "nationalization" of YPF SA was a two-step process for the benefit of the Kirchner and Eskenazi Families.

2) To begin with, the Kirchner Family compelled YPF SA's private controlling shareholder at the time, the Spanish energy company

---

[7] Idem 1.

Repsol, to sell a 25% stake to their figurehead, the Eskenazi Family.

3) The Eskenazi Family, foreign to the energy sector, did not invest a single cent of equity in this multi-billion-dollar transaction, and right before established the Petersen Group –Plaintiffs herein– in Spain and Australia. Everything was financed through various loans of approximately $3.4 billion, which were going to be repaid via dividends of YPF SA. Some of the dividends distributed were fraudulent based on altered reserves and ancillary.

4) Repsol SA benefited from such transaction via free-repatriation of dividends and ancillary. The Eskenazi Family was placed at the helm of YPF SA's management.

5) The Kirchner Family –in turn, at the helm of all relevant Argentinean governmental institutions– subsequently triggered the political decision to nationalize YPF SA by taking Repsol SA's controlling stake but excluding the one held by their alleged figurehead, the Eskenazi Family.

6) At this juncture no more dividends were paid, including to the Eskenazi Family. The Eskenazi Family defaulted those loans –mostly repaid by then– and their for-the-occasion investment vehicle in YPF SA –Petersen Group– went bankrupt in Spain on a "voluntary basis". They filed for bankruptcy on their own in the jurisdiction they had selected outside of Argentina, in tandem with Repsol SA, just before executing the share purchase agreement and precisely to that effect.

7) The Eskenazi Family –once more, the alleged figurehead of the Kirchner Family– entered into an agreement with Burford Capital Ltd. and ancillary to finance and pursue these expensive legal proceedings and ultimately split the $16.1 billion plus award (30/70 split).

8) Burford Capital Ltd. has already monetized part of its own share in such award to undisclosed third-party investors.

**9)** The outcome of this District Court's $16.1 billion plus award in simple economic terms implies compensating the Plaintiffs for a non-existent investment in YPF SA by the Eskenazi and Kirchner Families of roughly 25% of its total shares, as a result of a "nationalization" process triggered by the Kirchner Family from the administration of the Argentine Government that excluded what could be considered as their "own" participation in YPF SA.

**10)** As a consequence, Argentinean taxpayers should be obliged to pay such $16.1 billion plus award to corrupt individuals, who in part were already convicted in criminal proceedings by Argentinean federal courts in schemes quite similar to the one described herein, including figureheads close to the Kirchner Family and the fraudulent appropriation of massive public funds via large infrastructure projects, while resorting to investment vehicles and money transfers around the world.

## SUMMARY OF THE ARGUMENT

The present case poses novel issues of law to the Court as a result of its fairly unique factual background, geographic diversity, as well as conflict of laws regarding the activation of jurisdictional powers by US courts and internationally with eventual contradictory or conflictive outcomes. A precedent like the one subject to review could have significant impact worldwide regarding the potential access to US jurisdiction by foreign plaintiffs, against sovereign nations, in factual settings condoning and embracing State-related corruption.

RA4ARG pleads this Court for such not to be the case, in tandem with a view of its jurisdictional powers that calls for restrain based on the understanding the United States of America is not posed to solve all issues and conflicts around

26

the world, even considering their profoundly tragic and horrific origin.  See

*Federal Republic of Germany v. Philipp*, 592 U.S. ___ (2021) (*"We have*

*recognized that United States law governs domestically but does not rule the*

*world.  We interpret the FSIA as we do other statutes affecting international*

*relations: to avoid, where possible, producing friction in our relations with [other]*

*nations and leading some to reciprocate by granting their courts permission to*

*embroil the United States in expensive and difficult litigation.").*

More precisely, within the complex but clearcut facts of this case, the US

legal system is not called to entertain, foster and/or propel foreign-government

corruption out of its own Courts and rulings –*i.e.*, plain criminal activity.

Furthermore, the victims of the alleged ongoing criminal activity in these legal

proceedings are both the United States of America and the Republic of Argentina

in its own people, when not the Kingdom Spain due to more recent criminal

complaints of money laundering against the Eskenazi Family and their Petersen

Group in such jurisdiction (App. J at A-216; App. K at A-223; App. L at A-239).

RA4ARG claims the District Court, until the present day, is a victim of

"fraud on the Court" coming from a conspiracy by which the "tainted claims" held

by the Eskenazi Family through their Petersen Group –listed as Plaintiffs while

counting on the financial and technical assistance of Burford Capital Ltd.– were

masqueraded as a legitimate dispute of private law between those shell-companies,

27

on the one side, and the Republic of Argentina and YPF SA, subject to the control of the Kirchner Family, on the other side.

In fact, as proven via evidence on record, the interests of the Argentinean Kirchner and Eskenazi Families –specifically, from the Province of Santa Cruz– were aligned at the time of enriching themselves via various State-related businesses, and the entry to and exit from YPF SA by the Eskenazi Family is not an exception to such a pattern, one in which the Kirchner Family resorted to the Eskenazi Family as its figurehead, partner and/or associate in such alleged criminal scheme (D.Ct. Dkt 720, Ex. 1-2; Dkt 36, Ex. 7; App. L at A-239).

In the end and for practical purposes, the Plaintiffs, led by the Eskenazi Family's claims brought forward by Burford Capital Ltd., and the Defendants, led by the Kirchner Family's interests at the helm of the Argentine government and YPF SA, were "on the same side of the counter."

Taking into consideration this context, only RA4ARG has pleaded for relief upon the abovementioned specific grounds in roughly 10 years of litigation before this forum. And there is a concrete and clear reason for it. The Plaintiffs' lawsuit of 4/8/2015 was filed when Cristina Fernández de Kirchner was President of Argentina; and the District Court's final judgment of 9/15/2023 was issued when such same individual was Vice President of Argentina. As a consequence, who would have argued that their own clients, either as Defendants or Plaintiffs –the

28

Kirchner and Eskenazi Families and ancillary at the Republic of Argentina and/or YPF SA–, were guilty of alleged criminal activity, thus precluding the lawsuit from progressing in US courts? As a sheer fact, nobody in approximately 10 years, only RA4ARG pursuant to Rule 60.

Both parties gave the underlying substantive process an aura of legal respectability that it lacked at the core from the beginning. Therefore, the District Court analyzed this "conflict" mostly as strict issues of private law after deciding to activate its jurisdictional powers, only to apply New York law to what for the most part must have been decided under Argentinean law and within Argentinean courts, if there had been a case for it. In sum, the District Court resolved a masqueraded international private law conflict by interpreting decisive Argentinean law as understood by its own lens under New York law.

Evidently, if the District Court would have approached this theoretical conflict as a further attempt by individuals engulfed in government-related corruption to continue defrauding Argentinean taxpayers, this time by resorting to the District Court via "fraud on the Court", the appreciation of the whole situation under public international law –comity principle– should have mandated the diametrically opposite outcome. And this is the right frame to look at now.

29

## ARGUMENT AND STANDARD OF REVIEW

### ISSUE I:  Interested-Party Intervention

Did the District Court apply the correct caselaw, *in re*, *D'Amato v. Deutsche Bank,* 236 F.3d 78, 84 (2d Cir. 2001) and *Restor-A-Dent Dental Lab'ys, Inc. v. Certified Alloy Prods., Inc.*, 725 F.2d 871, 874 (2d Cir. 1984), to deny the intervention as of right and permissive requested by RA4ARG (interested-party) per Rule 24(a)(b) as untimely and with no direct, cognizable interest?

Standard of review: *de novo*.   The District Court's interpretation of applicable law is reviewed *de novo, in re, Commack Self-Serv. Kosher Meats, Inc. v. Hooker*, 680 F.3d 194, 203 (2nd Cir. 2012).

### a.  *Legal standing, unique role and advocacy*

As already corroborated in these legal proceedings, RA4ARG is an *interested party* that attained its US charitable, tax-exempt status last 12/18/2024; it was established last 3/6/2024; and it is devoted to *"strengthening [Argentina's] republican institutions with democratic participation, with the goal of fostering judicial independence and integrity in public office, while also advocating for personal rights and free-market economy."* (D.Ct.Dkt. 720, Ex. 1-2; Dkt. 21 at pp. 139-155).

In this sense, RA4ARG did not exist during the underlying proceedings that derived in the 9/15/2023 final judgment from the District Court. And the issues raised under Rule 60(b)(4)(6) and (d)(1)—(3) have not only been solely advocated by RA4ARG, but, as already explained, they could have not been advocated by any of the parties in this conflict, since such a course of action would have curtailed the very same interests in this *litis* of the "controlling individuals" of both the Plaintiffs (Eskenazi Family and associates) and the Defendants (Kirchner Family and associates). Nobody would have materialized claims of alleged criminal activity against their own clients and/or the ultimate decision-makers of those same clients.

As a matter of fact, there was a need for an unprecedented judgment like the one under review to trigger the extraordinary relief sought after under Rule 60 by RA4ARG. Without a doubt, there is no due diligence that RA4ARG –non-existent and non-capable before 12/18/2024– could have pursued to prevent the adverse $16.1 billion award against the Republic of Argentina dated 9/15/2023. However, RA4ARG is doing what only this party can do for such final judgment to be set aside by pursuing proper and timely relief under Rule 60.

In light of the aforesaid, RA4ARG does claim it is entitled to be an interested-party to these legal proceedings as a matter of right and via permissive intervention. In any case, it must be reiterated that there is no strict need to be a

31

party to claim relief under Rule 60. Unequivocally, *"Fed. R. Civ. P., Rule 60(b) states, in part, that a court may "relieve a party or its legal representative" from a judgment or order. Fed. R. Civ. P. 60(b)… several circuit courts have permitted a non-party to bring a Rule 60(b) motion or a direct appeal when its interests are strongly affected."* See *Grace v. Bank Leumi Tr. Co. of NY*, 443 F.3d 180, 188 (2d Cir. 2006) (carving out *"an exceedingly narrow exception to the well-established rule that litigants, who were neither a party, nor a party's legal representative to a judgment, lack standing to question a judgment under Rule 60(b)*" where *"there is a strong possibility that the predicate judgment that forms the basis of this fraudulent conveyance action is the result of a settlement process devoid of due process protections and marred by serious procedural shortcomings")*; see *Binker v. Com. of Pa.*, 977 F.2d 738, 745 (3d Cir. 1992); *Southerland v. Irons*, 628 F.2d 978, 980 (6th Cir. 1980) (*per curiam*).

Moreover, even the District Court can invoke and grant such relief *sua sponte*. As a general issue *"a majority of circuits to have considered the power of a district court to vacate a judgment under Rule 60(b) have concluded that district courts have the discretion to grant such relief sua sponte."* See *Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 385 (7th Cir. 2008) (collecting cases in circuit split).

32

In addition, in connection with RA4ARG's legal standing pursuant to Rule 24, it is conditioned upon no other legal remedy available, including *amicus curiae*, which is the case herein.  See *Feller v. Brock*, 802 F.2d 722, 729 (4th Cir. 1986) *("Participation by the intervenors as amicus curiae is not sufficient to protect against these practical impairments. Amicus participants are not able to make motions or to appeal the final judgment in the case.")*; see *Brooks v. Flagg Bros.*, Inc., 63 F.R.D. 409, 414–15 (S.D.N.Y. 1974).

### b.  *Factual background and timing*

The caselaw invoked by the District Court is unfortunate because of its absolute inapplicability to the case at hand.  The facts of *D'Amato v. Deutsche Bank* dealt with tragedies and grievances related to the Nazi regime; and in such precedent this Court deemed untimely some objections to a final collective settlement from a third-party, meaning the petitioner should have joined the lawsuit from the onset.  However, nobody informed the Republic of Argentina that in the present case it could be compared to unspeakable crimes in the mold of Nazi Germany, much less that the $16.1 billion award had anything to do with such offensive fallacy.[8]

---

[8] Argentina welcomed Jewish immigrants in massive numbers from early on, needless to say as a result of European anti-Semitism and Nazism. The full occupation of the Argentinean Patagonia ended in 1883, at the time of convoluted times in Europe, where the variants of rationalism, totalitarian ideologies with

There was a reason why the Eskenazi Family got awarded with the Bank of Santa Cruz Province in its "privatization" process by the Kirchner Family, including the administration of its Provincial Trust Fund (public funds in an oil-rich province); why the Eskenazi Family was granted the gift of a 25% stake in YPF SA by the Kirchner Family –without spending a cent and no prior experience in the energy sector–; why Repsol SA consented to and participated in such a scheme; why the Eskenazi Family grabbed the CEO and other top positions at YPF SA; and why the Eskenazi Family "voluntarily" filed for bankruptcy in Spain and sued the Republic of Argentina and YPF SA in the United States after not having been "compensated" for the original gift of a quarter of all YPF SA shares (App. L at A-239).

All of those reasons are related to spurious financial and otherwise economic benefits, never the Eskenazi Family's origin as well as its religious and/or ethnic background. And when it gets to the sizable and well-respected Argentinean Jewish community, it must be remembered that in 2013 the Kirchner Family, such

---

formal pronouncement like the *Communist Manifesto* of 1890 and not so romantic nationalisms began to mix and boil with great force. Based on sizable Jewish settlers in Argentina at the time, Theodore Herzl in *The Jewish State* or *Der Judenstaat* (1896) and Leon Pinsker in *Autoemancipation* (1882) formally considered the Patagonia region not only as a preferred destination of the Jewish population from Eastern Europe, but as a concrete goal of establishing the State of Israel in this newly conquered land if such opportunity were available. Accusing Argentina of Nazism would be nothing short of surreal.

sort of partner of the Jewish Eskenazi Family, on the head of former President Cristina Fernández de Kirchner, entered into an international treaty with the Republic of Iran, which in 2015 was finally declared unconstitutional.

Such illegal international agreement entailed lifting Interpol red-notices against the Iranian perpetrators of an unspeakable terrorist attack in Buenos Aires –the bombing of the Jewish Coop where 85 people died and 300 more were injured[9]–, all in exchange for favorable commercial dealings. The Argentinean Jewish prosecutor Alberto Nisman died for it; and criminal investigations have produced no conclusive results so far.

In sum, these are the individuals who commingled their monetary interests for this lawsuit to have its day and reward in US court. Thus, coming back to *D'Amato v. Deutsche Bank*, in the present case there is no settlement of any kind and RA4ARG is representing the Argentinean people in, arguably, the most

---

[9] After the 1992 bombing of the Israeli embassy in Buenos Aires –22 people died and 242 others were injured–, this 1994 terrorist bombing represents the largest attack on Jewish assets outside Israel since War World II. The Argentinean people are not responsible for any of them; as much as the American people are not responsible for 9/11. Currently, there are almost 200,000 people of Jewish background in Argentina; and approximately 80% of them reside in Buenos Aires. Many Jewish-Argentineans over the last 60 years or so settled in Israel. The Argentinean Jewish community represents the sixth largest worldwide; and Buenos Aires is the second largest city worldwide after Paris, France, without counting the United States and Israel.

shocking corruption scandal of the Kirchner Family regime in that country: YPF SA, the Eskenazi Family, and ancillary.

As a sheer fact, RA4ARG is behind all of those who do not need to enter into any settlement –45 million people minus a few Argentineans related to the Plaintiffs–, because they do believe that no taxpayers monies should reward State-related corruption. It would be illegal to do so; and it would be plain racketeering to request such an illegal payment.

As a result, please do note the extraterritoriality of the *Racketeer Influenced and Corrupt Organizations Act* (RICO) would be permissible under US law because the consummation of the alleged criminal scheme takes place via some legal action and Court decree out of the United States. See *(contrario sensu) RJR Nabisco, Inc. v. European Community*, 136 S. Ct. 2090 (2016). Such an overall situation is against the national and strategic interests of the United States of America. This topic is further discussed below in the context of fraud on the Court within US jurisdiction.

As to timing, RA4ARG's claims under Rule 60 demand a final judgment for them to be activated, as opposed to any other situation. The timing of RA4ARG's intervention is necessarily framed as an event post final judgment of the District Court. And within such frame, the claims per Rule 60(b)(4)(6) are subject to "reasonable time" and the claims per Rule 60(d)(1)—(3) are "timeless", not subject

to any time limitations. Considering RA4ARG attained its tax-exempt status last 12/18/2024, RA4ARG's filings of 2/17/2025 were produced within "reasonable time", eventhough some of its claims are "timeless" –they are always *per se* timely.

### c. *Direct, concrete and cognizable interest*

With regards to the clearly direct, concrete and cognizable interest of RA4ARG in this case, the District Court once again resorted to the wrong precedent to justify the unjustifiable, *in re*, *Restor-A-Dent Dental Lab'ys, Inc. v. Certified Alloy Prods., Inc.*, 725 F.2d 871, 874 (2d Cir. 1984). RA4ARG has the most direct, concrete and cognizable interest of all, the one of the Argentinean people not having to afford more than $16.1 billion fruit of government-related corruption via a Court award out of "fraud on a US District Court" without jurisdiction.

Please note this party does not need to persuade this Court as to the prior affirmation. It is an undeniable fact, not an argument of persuasion left at this Court's discretion. If such award does come from claims tainted by corruption at inception, and it does, the only way to extract such award from the District Court was by concealing its true nature, by masquerading it as a legitimate private law claim between two parties in an honest legal dispute or conflict.

37

Here there is concrete pressure and incentives to achieve an economic or financial benefit on the part of the Plaintiffs, an opportunity that led them to carry-out fraudulent activity before the US legal system, and the technical rationalization or justification of it as a plain honest legal dispute of private nature in the commercial domain and within a foreign expropriation process. As further elaborated below, the triangle elements of fraud are fully verified in this case.

This sort of direct, concrete and cognizable interest of more than $16.1 billion must not burden the Argentinean people, already overwhelmed by outrageous poverty ratios fruit of State-related corruption,[10] which must not hurt the reputation and integrity of the US federal judiciary. See *Alix v. McKinsey & Co., Inc.*, No. 20-2548 (2d Cir. 2022).

### d. *Intervention as of right*

It is worth mentioning that the eventual *stare decisis* effects of the District Court's final ruling give room for intervention as of right. See *Oneida Indian Nation of Wis. v. New York*, 732 F.2d 261, 265-66 (2d Cir. 1984). In particular, if we consider that Rule 24(a) must be liberally interpreted by making intervention as

---

[10] The $16.1 billion award represents the second largest debt held by the Republic of Argentina after the one held with the *International Monetary Fund* (IMF). As to poverty ratios inherited from the latest Kirchner regime in Argentina, see https://apnews.com/article/argentina-poverty-levels-uca-study-milei-devaluation-d5cb0a20b1e768efdeafbad5bf05eded.

of right appropriate even if the proposed intervenor's showing is weaker as to others. See *United States v. Hooker Chems. & Plastics Corp.,* 749 F.2d 968, 983 (2d Cir. 1984). And the statutory evolution of Rule 24 from the 1938 version to its 1966 version and onwards, to the very least, confirms the legislature intent to open up the federal jurisdictional threshold to third-parties[11] who in fact do have a legitimate interest to intervene in the conflict at hand, needless to say when the existing parties have not sheltered it for whatever the reasons.

As previously claimed before the District Court, RA4ARG has a *"direct, substantial, and legally protectable"* interest in the substantive matter of this legal dispute. See *Washington Elec. Coop. v. Massachusetts Mun. Wholesale Elec. Co.,* 922 F.2d 92, 97 (2d Cir. 1990). Such an interest is the opposing *"mirror image"* of the Plaintiffs' interests as well as some of the Defendants' past officers' interests. To the prior, see *Builders Ass'n of Greater Chicago v. City of Chicago,* 170 F.R.D. 435, 440–41 (N.D. Ill. 1996). And to the latter, it has been stated that *"when a party to an existing suit is obligated to serve two distinct interests, which, although related, are not identical, another with one of those interests should be entitled to intervene."* See *United Guaranty Residential Ins. Co. v. Philadelphia Sav. Fund Soc'y*, 819 F.2d 473, 475 (4th Cir. 1987); *Kleissler v. United States*

---

[11] Kennedy, John E, "Let's All Join In: Intervention Under Federal Rule 24", *57 Kentucky Law Journal 3*, Art. 2, 1969, 329-381.

*Forest Service*, 157 F.3d 964, 972 (3d Cir. 1998); *Coalition of Arizona/New Mexico Counties for Stable Econ. Growth v. Dep't of Interior,* 100 F.3d 837, 845 (10th Cir. 1996).

As a principle of law vouching for intervention in the context of potentially divergent, conflictive and/or dissimilar interests, see *United States v. Hooker Chemicals & Plastics Corp.*, 749 F.2d at 985 (2nd Cir. 1984); *Stuart v. Huff*, 706 F.3d 345, 352 (4th Cir. 2013); *Commonwealth of Pennsylvania v. President of the United States*, 888 F.3d 52 (3d Cir. 2018) (Little Sisters of the Poor); *Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538 n.10 (1972).

Unquestionably, from a practical standpoint RA4ARG and the entire Argentinean population *"stand to gain or lose by the direct legal operation"* of the District Court's final ruling. See *Teague v. Bakker*, 931 F.2d 259, 261 (4th Cir. 1991). Only RA4ARG is sheltering an independent view calling for the vacatur of the final $16.1 billion award against the Republic of Argentina.

### e.     *Permissive intervention*

If intervention as of right rules the day, permissive intervention is by default applicable in itself, also taking into account that allowing legitimate

40

grievances to be heard is transcendent enough to elude self-imposed Court-boundaries.[12]

RA4ARG does have a *"claim or defense that shares with the main civil action a common question of law or fact"* (Fed. R. Civ. P., Rule 24(b)(1)(B)), yet with very different outcomes never advocated as such before the District Court. This can never imply an unacceptable delay since *"[r]ule 24(b) mentions only undue delay; normal delay does not require denying intervention, because adding parties to a case almost always results in some delay."* See *Steves & Sons, Inc. v. Jeld-Wen, Inc.*, 323 F.R.D. 553, 561 (E.D. Va. 2018); *United States Postal Service v. Brennan*, 579 F.2d 188, 192 (2d Cir. 1978).

This Court has repeatedly said that Rule 24(b) *"is to be liberally construed."* See *Yang v. Kellner*, 2020 WL 2115412, at *1 (S.D.N.Y. May 3, 2020) (quoting *Olin Corp. v. Lamorak Ins. Co.*, 325 F.R.D. 85, 87 (S.D.N.Y. 2018)). As opposed to Rule 24(a)(2), Rule 24(b) does not ask whether the movant has an interest at stake in the litigation. See *United States v. Local 683, Enterprise Ass'n*, 347 F. Supp 164, 166 (S.D.N.Y. 1972). Within this scenario, it is irrelevant whether RA4ARG, on behalf of the Argentinean people, has a direct, cognizable interest as

---

[12] Garner, Amy M., "An Attempt to Intervene in the Confusion: Standing Requirements for Rule 24 Intervenors", *69 University of Chicago Law Review 681*, 2002, 703.

41

required by the District Court, *in re*, *Restor-A-Dent Dental Lab'ys, Inc. v. Certified Alloy Prods., Inc.*, 725 F.2d 871, 874 (2d Cir. 1984).

On top, Rule 24(b) does not inquire as to whether the original parties adequately represent the movant's interests. See *Coleman v. Cty. of Suffolk*, 174 F. Supp. 3d 747, 754 (E.D.N.Y. 2016), aff'd, 685 Fed. App'x 69 (2d Cir. 2017). On the contrary, *"Rule 24 (b) is just about economy in litigation."* See *City of Chicago v. FEMA*, 660 F.3d 980, 987 (7th Cir. 2011). As claimed by RA4ARG before the District Court, judicial economy is highly served via a motion pursuant to Rule 60.

In essence, the legal threshold for permissive intervention is lower than the one for intervention as of right, and, as elaborated herein, RA4ARG does meet the standards imposed in both scenarios by Rule 24(a)(b). Please do note that *"the magnitude of this case is such that [RA4ARG's] intervention will contribute to the equitable resolution of this case."* See *Kootenai Tribe of Idaho v. Veneman*, 313 F.3d 1111 (9th Cir. 2002).

## ISSUE II: Rule 60 Relief

Should this Court remand the core final judgment of the District Court dated 9/15/2023 per Rule 62.1(A)(3)(B)(C), in tandem with caselaw invoked by the District Court, *in re, Toliver v. Cnty. of Sullivan,* 957 F.2d 47, 49 (2d Cir. 1992), insofar RA4ARG's encompassing request for relief per Rule 60(b)(4)(6) and (d)(1)—(3)?

42

Standard of review: *de novo*. The District Court's determinations concerning sovereign immunity are reviewed *de novo, in re, NML Capital v. Republic of Argentina*, F.3d 254, 256-57 (2d Cir. 2012). Notwithstanding, please do note that if the District Court had denied, granted or deferred the relief pursued by RA4ARG under Rule 60, such decision could have been subject to the abuse of discretion standard of review. See *Marco Destin, Inc. v Levy*, No. 23-1330 (2d Cir. Aug. 8, 2024).

However, it so happens that the District Court did not make any those potential decisions since it strictly declined jurisdiction because of the ongoing ordinary appeal process, while pointing out to the need of first requesting permission from this Court for the judgment under review to be remanded under Rule 60, *in re, Toliver v. Cnty of Sullivan*, 957, F.2d 47, 49 (2nd Circ. 1992), Rule 62.1(A)(3)(B)(C), FRAP Rule 12.1. Thus, the applicable standard is *de novo* in itself.

### a. Timely request, unprecedented setting and extraordinary remedy.

RA4ARG argues that it is in the best interests of justice not to silence its voice. No other party has alleged and proven what in fact emerges from RA4ARG's exclusive intervention in these legal proceedings. Although the Republic of Argentina did proclaim twice, as a result of such intervention, the annihilation of State-corruption by President Javier Milei, even under US

43

jurisdiction, it has also affirmed that *"the Republic has no affiliation with RA4ARG or its members, and no role or involvement in its submissions below or the present motion."* (Dkt. 37, App. G at A-201).

Therefore, the burden of such not so light task within these legal proceedings falls exclusively on this party's shoulders, not the courageous and praiseworthy stance of the Argentine government. RA4ARG's unique intervention is not equally or similarly covered and/or replaced by any other existing party to this conflict, since its advocacy represents distinctive and unrepeated arguments that no other party has ever put forward within these legal proceedings up to the present date.

Regarding the viability of Rule 60(d), as mentioned, there is no time limitations of any nature whatsoever per normative command *("This rule does not limit a court's power to: (1) entertain an independent action to relieve a party from a judgment, order, or proceeding … or (3) set aside a judgment for fraud on the court", Rule 60(d)).* Regarding the viability of Rule 60(b), it has been stated that *"[it] must be made within a reasonable time and must be used sparingly as an equitable remedy to prevent manifest injustice."* See *United States v. Alpine Land & Reservoir Co.*, 984 F.2d 1047, 1049 (9th Cir.1993); as long as the pleader must demonstrate *"extraordinary circumstances which prevented or rendered him*

44

*unable to prosecute [his case]."* See *Tani,* 282 F.3d at 1168 (*citing Martella v.*

*Marine Cooks & Stewards Union*, 448 F.2d 729, 730 (9th Cir. 1971).

The evolution of such Rule 60(b) norm from a *"six-month limitation"* to

the current wording has long fostered the posture that courts can exercise their

*"inherent powers to judgments where the term had not expired or where 60(b)*

*did not provide relief in some traditionally provided post-term relief,"* to the

extent that Rule 60(b)(6) has been used to *"circumvent directly the one-year*

*limit."*[13]  See *Klapprott v. United States*, 335 U.S. 601 (1949).

The final judgment under scrutiny was entered on 9/15/2023; RA4ARG

was established on 3/6/2024; it attained its tax-exempt status on 12/18/2024;

and it filed its claims before the District Court on 2/17/2025.  It is thus within

reasonable time, irrespective of allegations of fraud on the Court not subject to

any time limitations that in turn activate those constrained by such reasonable

timeframe.

### b.  Rule 60(b)(4): "Judgment void" for lack of jurisdiction, new applicable law

From the beginning of the *litis* and over the years, the Republic of Argentina

has put forward various defenses to the Plaintiffs' claims, including but not limited

---

[13]  Notes, "Federal Rule 60(b): Relief From Civil Judgments", *61 The Yale Law Journal 1952*, 77-81-84.

to: (a) pursuant to Rule 12(b)(1) and FSIA 28 U.S.C. §§ 1602 to 1611, for lack of subject-matter jurisdiction, and pursuant to Rule 12(b)(2) and FSIA, for lack of personal jurisdiction; (b) under the act of state doctrine; (c) on the ground that the prosecution of such claims violates New York's champerty statute, N.Y. Judiciary Law § 489; (d) under the doctrine of *forum non conveniens*; and (e) pursuant to Rule 12(b)(6), on the ground that, based on the complaint's allegations, Plaintiffs' alleged damages were not caused by the alleged wrongful conduct by the Republic of Argentina; and ancillary.[14] This country confidently insists on those arguments within the ordinary appeal process before this Court (Dkt. 37; App. G at A-201).

On the contrary, none of the defenses and arguments posed by RA4ARG revolved around the aforesaid because for any relief under Rule 60 to prosper it must not overlap or superpose with the ordinary appeal process –there cannot be a duplication of appellate proceedings based on the same grounds–; and such ordinary appeal process from the Defendants' perspective is heavily constrained to the issue of lack of jurisdiction under the premises contained in the prior paragraph, never those encapsulated by Rule 60(b)(6) and (d)(1)—(3) –namely, US judicial policy-making and alleged criminal activity. See *United Student Aid*

---

[14] *In re, Petersen Energía Inversora v. Argentine Republic and YPF*, United States Court of Appeals, Second Circuit, Docket Nos. 16-3303-cv(L), 16-3304-cv(Con) (July 10, 2018) (Winter, Calabresi, and Chin, Circuit Judges).

*Funds, Inc. v. Espinosa*, 130 S. Ct. 1373, 1374 (2010) *("[A] motion under Rule 60(b)(4) is not a substitute for a timely appeal.").*

As a consequence, last 2/28/2025, RA4ARG nonetheless embarked on the specific issue of lack of jurisdiction –judgment void under Rule 60(b)(4)– because new applicable law from this Court came into effect on 2/19/2025; meaning two days after RA4ARG's initial filings pleading for relief under Rule 60(b)(6) and (d)(1)—(3) (D.Ct.Dkt. 724, 725; App. E at A-166). And it is within this context that RA4ARG claims the applicability of the opinion entered into, *in re*, *Hussein v. Maait*, No. 22-1506 (2d Cir. 2025), thus in connection with Rule 60(b)(4) [final judgment void for lack of jurisdiction] vis a vis Rule 60(b)(6) [a critical reason of US judicial policy-making justifying the vacatur of the final judgment] as well as Rule 60(d)(1)—(3) [fraud on the Court also mandating to set aside the final judgment]. Any of those grounds, jointly or apart, call for the vacatur of the District Court's final judgment of 9/15/2023 and all of the prior interconnected ones.

The basic facts of a private law dispute between parties engulfing a foreign government, under *Hussein v. Maait,* are astonishing applicable to the "cosmetic" spinal events claimed by the Plaintiffs:

- Dr. Ahmed Diaa Eldin Ali Hussein, a dual citizen of Egypt and the United States, sought to enforce an Egyptian administrative court ruling and a related ministerial decree in the United States. These rulings purportedly entitled him to compensation for the

47

expropriation of his shares in the SIMO Middle East Paper Company by the Egyptian government in the 1990s. Hussein filed an enforcement action in New York State court against Dr. Mohamed Ahmed Maait, the Egyptian Minister of Finance, in his official capacity.

- The case was removed to the United States District Court for the Southern District of New York by Maait, albeit after the 30-day deadline for removal. The District Court found that Egypt was the real party in interest and allowed the late removal under Section 1441(d) of the U.S. Code, which permits enlargement of the removal period for cause. The court then dismissed the suit under Rule 12(b)(1) for lack of subject matter jurisdiction, concluding that Egypt was immune under the FSIA and that no exceptions to this immunity applied.

- On appeal, the United States Court of Appeals for the Second Circuit affirmed the District Court's decision. This Court agreed that Egypt was the real party in interest, as Hussein's claims were fundamentally against the Egyptian government and sought compensation from the public treasury. This Court also upheld the District Court's finding of cause to extend the removal period, noting the lack of prejudice to Hussein and the procedural challenges faced by Maait in securing US counsel. Finally, this Court determined that Hussein had waived any argument regarding exceptions to FSIA immunity by not raising them on appeal. Thus, *the dismissal for lack of jurisdiction was affirmed.*

As a result of such new precedent of this Court as of 2/19/2025, the elementary factual and legal considerations of the ruling from the District Court must be entertained anew:

- The District Court considered arguments both in favor and against the Court's jurisdictional powers, and ruled in favor of activating them in this case.[15]

---

[15] Idem 14.

- The District Court deemed that the party responsible for neither having tendered for nor acquired the shares held by the Plaintiffs, as a result of the "nationalization" process of YPF SA, was the Republic of Argentina. In short, the Plaintiffs alleged YPF SA's by-laws (article 7) should have been enforced via a tender offer for all shares, including those held by them. That did not happen; the Republic of Argentina solely expropriated the controlling stake held by the Spanish energy company Repsol SA.

- YPF SA's by-laws are in substance an agreement yet subject to governmental approval for its enforcement via an administrative resolution (initially the Argentinean Secretary of State, as in the case of any other US corporation), regardless of its public-status per local law and any pertinent listing.

- At the normative level, the nationalization process of YPF SA was triggered by a presidential decree from former President Cristina Fernández de Kirchner, who also decided –in tandem with her Minister of Economy at the time, Axel Kicillof, among others– not to tender for and acquire the Plaintiff's shares after having taken over Repsol SA's controlling stake.

- The District Court didn't dismiss the Plaintiffs' lawsuit for lack of jurisdiction, concluding the Republic of Argentina in the present case was not immune under FSIA. The District court awarded $16.1 billion plus to the Plaintiffs.

Insofar the viability of Rule 60(b)(4), the Supreme Court has set the standard by holding that *"[a] void judgment is a legal nullity"* and *"…a void judgment is one so affected by a fundamental infirmity that the infirmity may be raised even after the judgment becomes final"*, while also clarifying that *"a judgment is not void…simply because it is or may have been erroneous."*

Instead, it must be *"premised…on a certain type of jurisdictional error"*. See

*United Student Aid Funds, Inc. v. Espinosa*, 130 S. Ct. 1373, 1374 (2010).

Stemming from the factual grounds of this case, RA4ARG claims that

relief pursuant to Rule 60(b)(6) and (d)(1)—(3) does conform such fundamental

infirmity, premised on a jurisdictional mistake pursuant to Rule 60(b)(4), which

as already defined in concrete terms is not a substitute to any ongoing appeal

and it could only be raised after the judgment became final. Those new

substantive grounds are elaborated below.

### c. Rule 60(b)(6): "Any other reason" that justifies vacatur

As recounted in prior filings, the "catch it all" provision contained in Rule

60(b)(6), as long as it allows vacatur of the final judgment from the District Court

based on "any other reason" that justifies it, clearly denotes some distinctiveness or

uniqueness that should not be understood as exclusionary –conceptually speaking–

of all other reasons contained in Rule 60(b)(1)(2)(3)(4)(5).

Although it is very likely that such "any other reason" would entail an error

or mistake, the basic elements of intrinsic and extrinsic fraud per fraud on the

Court coming into play, various grounds in a judgment void for lack of

jurisdiction, etcetera, RA4ARG is neither circumventing any existing appeal

process nor trampling into those other specific grounds for relief capped by a one-

year timeframe. *"Rule 60(b)(6) is a grand reservoir of equitable power to do*

*justice in a particular case when relief is not warranted by the preceding clauses…"* See *Balentine v. Thaler*, 626 F.3d 842, 846 (5th Cir. 2010), *cert. denied*, 564 U.S. 1006 (2011) (quoting *Batts v. Tow-Motor Forklife Co.*, 66 F.3d 743, 747 (5th Cir. 1995)).

Along these lines, it is worth highlighting that *"[w]hen a party timely presents a previously undisclosed fact so central to the litigation that it shows the initial judgment to have been manifestly unjust, reconsideration under rule 60(b)(6) is proper."* See *Good Luck Nursing Home, Inc. v. Harris*, 636 F.2d 572, 577 (D.C. Cir. 1980). *"[R]elief under Rule 60(b)(6) is all the more appropriate when 'it involves not only the interests of the [party], but that of a third party.'"* See *People for the Ethical Treatment of Animals v. U.S. Dep't of Health & Hum. Servs.*, 901 F.3d 343, 355 (D.C. Cir. 2018) (quoting *Comput. Pros. for Soc. Resp. v. U.S. Secret Serv.*, 72 F.3d 897, 903 (D.C. Cir. 1996)).

The uniqueness and distinctiveness of the particular "any other reason that justifies relief" within this case goes back to the "color" of corruption tainting the Plaintiffs' claims from inception. Putting aside evidence on record and multiple criminal complaints and proceedings in different jurisdictions over the years –including the direct and indirect opinion of President Javier Milei in these legal proceedings and recent sanctions to critical former Argentine officials in this case by the US government–, the clear appearance of government related-corruption

cannot be overcome by simply deciding to treat this conflict as an honest commercial dispute.

Ultimately, this case is not about a presumable conflict about the interpretation of article 7 of YPF SA's bylaws as well as various issues of Argentinean and US law pegged to the prior, all within the context of such company's expropriation that did not include the Plaintiffs' holdings –the Eskenazi Family–, which was triggered by the Argentine government under the control of the Kirchner Family –the ones who brough the Eskenazi Family into YPF SA with a 25% participation for free, without disbursing a single cent of genuine equity.

As also mentioned in prior filings, the US national and strategic interests are hampered by government-related corruption abroad, and the beacon of light embedded in the *Foreign Corrupt Practices Act* (FCPA) comes to fruition when such light turns into multiple focal points in foreign jurisdictions and courts. This means FCPA finds its mirror image in the normative and judicial efforts abroad. In this scenario, American companies flourish and are statistically more competitive.[16]

Thus, how those commendable guiding principles of FCPA are going to be accomplished if they are eroded in their foundations by condoning government-

---

[16] Arbastkaya, Maria, Mialon, Hugo, "The Impact of Foreign Corrupt Practices Act on Competitiveness, Bribery, and Investment", *22(1) American Law and Economics Association*, (April 2020), 105-126.

related corruption regarding YPF SA from 1999 onwards, and in particular via the Eskenazi Family –their "claims" triggered this lawsuit–? Without a doubt, no American company could have entered into YPF SA –a buoyant, successful and growing energy company– but Repsol SA from Spain; and no American company could have partnered with the Kirchner Family to enter into YPF SA but someone like the Eskenazi Family; and no other but the latter could have done so in the scandalous and outrageous corrupt terms, equally involving Repsol SA from Spain, that in fact took place (D.Ct.Dkt. 720, Ex. 2; Dkt 36, Ex. 7; App. L at A-239).

At the very least, RA4ARG pleads this Court to prevent further government-related corruption by granting the relief requested herein. Not doing so would entail a lethal blow to FCPA globally, as well as circumvent recent caselaw geared at altering entrenched corrupt dynamics abroad. See *United States v. Napout*, No. 18-2750 (2d Cir. 2020). The world needs more decent and transparent people; the world needs that sort of American horizon aiming for a clean handshake and pure eyesight. None of it was present in the case brought before the District Court; and none of it should be condoned by this Court.

The aggravated circumstances in the situation under analysis indicate that those "tainted" by corruption would be handsomely rewarded for their illegal behavior within and by US courts. And this is in itself extremely unprecedented, extremely extraordinary, and extremely exceptional. Without fear of incurring any

53

misrepresentation of facts and law, there should not be a case of this nature in the entire history of judicial activity at the international level, one in which the exploits of government-related corruption in one country are recouped and enhanced at an exponential rate via a Court ruling from another country –from one currency to another, at an exchange rate that favors the Plaintiffs and against the applicable law on such matter.

Please do note that when the frame of this case comes into its right place, there are numerous precedents rejecting US jurisdiction due to situations dealing with foreign officials engulfed in corrupt matters unrelated to this forum, including dictators and tyrants of the most varied kind.[17]  See *Consejo de Defensa del Estado de la República de Chile v. Banco Santander Central Hispano, S.A.*, No. 09-20621, 2009 WL 2336429 (S.D. Fla. May 29, 2009) (concerning misappropriations by Augusto Pinochet); *Consejo de Defensa del Estado de la República de Chile v. Banco de Chile*, No. 109CV20614, 2009 WL 1612255 (S.D. Fla. Mar. 11, 2009) (same cause of action); *Republic of Haiti v. Aristide*, No. 05-22852, 2005 WL 3521251 (S.D. Fla. Nov. 2, 2005) (claims against Jean-Bertrand Aristide under RICO for *"theft, conversion, fraud and breach of fiduciary duty"*); *Republic of Iran v. Pahlavi*, 464 N.Y.S.2d 487 (N.Y. App. Div. 1983) (regarding

---

[17] Buxbaum, Hannah L., "Foreign Governments as Plaintiffs in U.S. Courts and the Case Against "Judicial Imperialism", *73 Washington and Lee Law Review 653*, 2016, 688-692.

misappropriations by the former Shah, Mohammed Reza Pahlavi); *Republic of Panama v. BCCI Holdings*, 119 F.3d 935 (11th Cir. 1997) (dealing with misappropriations by Manuel Noriega); *Republic of the Philippines v. Marcos*, 818 F.2d 1473, 1480–81 (9th Cir. 1987) (alleging that Marcos and others extorted and embezzled millions of dollars from the Philippine government), rehearing *en banc*, 862 F.2d 1355, 1360–61 (9th Cir. 1988) (en banc) (ruling, among other things, that the lawsuit was not barred under the act of state or political question doctrines); among several others.

The United States of America does not want to have anything to do with any of those undesired cases. It cannot be obviated the Kirchner and Eskenazi Families are Argentineans –from the Province of Santa Cruz–, and their involvement in this lawsuit is at the center of it because of their prior involvement in State-related corruption as partners, associates and/or principals and figureheads, respectively. Those parties are not even US naturalized citizens claiming for justice as a result of what a foreign government might have illegally and illegitimately done to them. In fact, those parties were either controlling the Argentine State and YPF SA or the beneficiaries coming from the decisions of the prior.

What is the role and situation of Burford Capital Ltd.? By its own purpose and admission, this enterprise is some type of intermediary who identified a potentially rewarding angle in highly expensive litigation by exploiting such sort of

55

link or governmental-relationship in US courts. Litigation at the international level is their concrete business purpose and expertise, but it must be highlighted that any of the claims pushed forward by them must be legitimate and legal.

In this sense, regarding eventual exceptions to sovereign immunity under FSIA, RA4ARG claims that an intertwined criminal scheme at the international level can never be conceptualized as a commercial or expropriation exception under the law.[18] In addition, the expropriation exception does not cover *domestic takings* (28 U.S.C. § 1605(a)(3)). See *Luxepress 2016 Corp. v. Government of Ukraine*, No. 18-V-812, 2020 WL 1308357 at *3 (D.D.C. Mar. 19, 2020).

Furthermore, YPF's bylaws do not cover the term expropriation (article 7 and ancillary), which could have been the case if actually intended so by those enacting them. See *Republic of Hungary v. Simon (per curiam)* (addressing international comity and forum *non conveniens* for expropriation exception cases under the FSIA), *Federal Republic of Germany v. Philipp*, 592 U.S. ___ (2021).

At this juncture, RA4ARG respectfully argues none of the aforesaid can be conceptualized as exceptions to the foreign sovereign immunity under FSIA –either commercial activity or expropriation. As a result, the District Court has gone beyond its powers at the time of exercising jurisdiction in this case, which by

---

[18] Restatement (Fourth) of Foreign Relations Law § 455, Reporter's Note 15, at 374 (2018); Fox, Hazel; Webb, Phillipa, *The Law of State Immunity*, 430-1 (3rd. ed, 2015).

default reaches an entire class of cases US court do not want or should not deal with because of their intrinsic nature and what it ultimately entails: foreign government-related corruption, through brokers or not, being rewarded by the legal system of the United States of America. An elementary appreciation of the comity principle cannot appease to it.[19]

About the novel concept of category or class of cases also applicable to Rule 60, see *Ben Sager Chems. Int'l, Inc. v. E. Targosz & Co.*, 560 F.2d 805, 812 (7th Cir. 1977); *Page v. Schweiker*, 786 F.2d 150, 159–60 (3d Cir. 1986) (Garth, J., concurring) (accepting as "hornbook law" that the proper standard is over a "class of cases"); *Gschwind v. Cessna Aircraft Co.*, 232 F.3d 1347 (10th Cir. 2000) (acknowledging the "category of cases" approach, irrespective of the ruling); among others.

### d. Rule 60(d)(1)—(3): Judgment set aside due to "Fraud on the Court"

The matter of criminal activity, in particular fraud on the Court, is one of public order under the laws of Argentina and the United States.[20] It must be

---

[19] Bleimaier, John Kuhn, "The Doctrine of Comity In Private International Law", *24 The Catholic Lawyer 4, 5*, Autumn 1979, 327-332.

[20] Please note the recent precedent from the Court, *in re, United States v. Antonius*, No. 21-1083, 7-10-2023 (2d. Cir. 2023), is not secluded to the United States of America; meaning that any of those involved in criminal activity within the United States vis a vis a victim of fraud and other crimes located in the Republic of

recalled the Plaintiffs argued via expert testimony –to foster their forum *non conveniens* view toward US jurisdiction in the underlying proceedings– that criminal liability or exposure was a real risk even for legal representatives if a civil trial were going to take place in Argentina (D.Ct.Dkt. 131), after the very same *Procurador del Tesoro* of Argentina –lead State Attorney– at the time held the opposite view (D.Ct.Dkt. 113).

The truth of the matter is that neither the Plaintiffs nor their legal representatives are immune from such a legal risk in both the United States and Argentina, alongside members of the Kirchner Family and others, precisely due to these very own legal proceedings. Such testimony should have included US expert opinion on criminal law, against any further advancement of the Plaintiffs' lawsuit. As a result, it is indeed not uncommon for Rule 60(d) to be claimed by criminal defendants insofar wrongdoings that could involve some specific counsel.[21]

Once again, Rule 60(d)(3) authorizes this Court to *"set aside a judgment for fraud on the court."* As a principle of law, this very specific relief is only appropriate in *"egregious cases …[…]… in which the integrity of the court and its*

---

Argentina, when the perpetrators have more than enough ties to be subject to criminal prosecution in both countries.

[21] Meadows, Christopher G., "Rule 60(b): Whether "Tapping the Grand Reservoir of Equitable Power" Is Appropriate to Right An Attorney's Wrong", *88 Marquette Law Review*, 2005, 997-1011.

*ability to function impartially is directly impinged."* See *Jordan v. U.S. Dep't of Lab.*, 331 F.R.D. 444, 451 (D.D.C. 2019), *aff'd*, No. 19-5201, 2020 WL 283003 (D.C. Cir. Jan. 16, 2020).

All in all, upon considering that fraud on the Court occurs when a *"party has sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by improperly influencing the trier or unfairly hampering the presentation of the opposing party's claim or defense."* See *Aoude v. Mobil Oil Corp.*, 892 F.2d 1115, 1118 (1st Cir. 1989). It is actually verified *"where the impartial functions of the court have been directly corrupted"*, and *"where the impartial functions of the court have been directly corrupted."* See *Robinson v. Audi Aktiengesellschaft*, 56 F.3d 1259, 1266 (10th Cir. 1995).

Regardless of any arguments about clear error and/or abuse of discretion by the District Court currently advanced by Republic of Argentina in the ordinary appeal process, it is a fact of reality that if the "color" and/or appearance of corruption tainting the Plaintiffs' claims at inception had been properly and thoroughly ventilated and scrutinized via US criminal investigations and ancillary –if RA4ARG's request for relief had been truthfully advocated in these legal proceedings from the beginning–, the District Court would have never ruled the way it ultimately did in this case. Such willful concealment and masquerading by

59

the Plaintiffs, with the appeasement of the Defendants along the way, placed the District Court within a tunnel that ended up at the wrong legal destination.

The Plaintiffs –the Eskenazi Family and associates– spotted an opportunity to extract an economic benefit via US courts under the premise the Defendants –the Republic of Argentina and YPF SA under the control of the Kirchner Family and associates– would never raise self-incriminatory allegations of State-driven corruption, impacting those individual parties presumably in opposite roles as Plaintiffs and Defendants, which in turn would not activate the US prosecutorial machine to the fullest extent precisely for being foreign-related criminal activity –not US-centered from inception. And they were absolutely right on criminal target.

The rationalization of such situation came down to some long-litigation debating issues pertaining to jurisdiction and alike, as if we were all before a plain commercial dispute within some abusive Latin-American expropriation process of a company that happens to be cross-listed in the United States.[22] The prior is

---

[22] As a result of "expropriations" of American companies by Latin American governments during the 1960s and 1970s, FSIA added an expropriation exception to foreign immunity in 1976, something non-existent in other normative bodies like the European one. However, caselaw clarified that *domestic takings* do not qualify for such an exception; meaning local expropriations like in the case of YPF SA and the Eskenazi Family –originally, Argentinean individuals from the Province of Santa Cruz, with off-shore vehicles in Spain and Australia–. Otherwise, anybody around the world could resort to US courts in light of some local expropriation with insufficient or no connectivity with the US. Idem 18.

nothing more than an ignominy only swindlers could advocate after the entire planet knowing the facts and sanctions on the Kirchner Family and others by the US government (D.Ct.Dkt. 720, Ex. 2; Dkt. 36, Ex. 7; App. H at A-207; App. L at A-239).

It must be highlighted that the Plaintiffs' claims finally supporting their lawsuit are false and not merely misleading. See *Thompson v. United States*, 604 U.S. ____ (2025) (about the requirement of false statements, beyond misleading, in the context of white-collar crimes). A claim derived from government-related corruption, with the characteristics ventilated in this case, provides as much good title as the one claimed by the holders of a stolen wallet passed on to them by the thief himself. Corruption and/or theft are not chameleons for the occasion, in order to appear and argue in US Court that there is a massive number of bills missing from such stolen wallet, which ought to be legally handed-in by its legitimate owner. By any standards a measure of that sort would be outrageous; and, as a matter of fact, there is no significant difference with the outcome of this litigation.

RA4ARG claims this case fulfills the standard applicable to fraud on the Court, after the Second Circuit established that *"[g]enerally, claimants seeking equitable relief through independent actions must … (1) show that they have no other available or adequate remedy; (2) demonstrate that [their] own fault, neglect, or carelessness did not create the situation for which they seek*

*equitable relief; and (3) establish a recognized ground – such as fraud, accident, or mistake – for the equitable relief." ... Among those "recognized ground[s]" is fraud on the court... To obtain relief on that basis, the [party] "must prove, by clear and convincing evidence, that the defendant interfered with the judicial system's ability to adjudicate impartially and that the acts of the [other party] must have been of such a nature as to have prevented the [party] from fully and fairly presenting a case or defense."* See *Marco Destin, Inc. v. Levy*, No. 23-1330 (2d Cir. Aug. 8, 2024).

The clear and convincing evidence of perusing the entire casedetail serves to illustrate absolutely none of what has been argued and proven by RA4ARG. There is no other remedy available, and if the ordinary appeal process were to finally imply the vacatur of the $16.1 billion judgment against the Republic of Argentina, none of the core substantive issues advanced by RA4ARG would turn moot due to their intrinsic nature and relevance under US law. See *Republic of Austria v. Altmann*, 541 U. S. 677 (2004) (*suit against Austria for return of paintings), quoted in Chafin v. Chafin,* 133 S. Ct. 1017, 185 (2013) *("Courts also decide cases against foreign nations, whose choices to respect final rulings are not guaranteed …[…] …U.S. courts continue to have personal jurisdiction over [the party], may command [such party] to take action even outside the United States, and may back up any such command with sanctions...").*

In addition, regarding the abovementioned applicability of RICO to this case, it must be highlighted that this Court vacated a lower Court's dismissal of a complaint under RICO upon the premise the plaintiff sufficiently alleged a "pay-to-play" scheme in connection with the defendant's role in bankruptcy proceedings, as an advisor, damaging the plaintiff and directly hurting the integrity of the federal legal system. See *Alix v. McKinsey & Co., Inc.*, No. 20-2548 (2d Cir. 2022). *("[W]e believe the district court gave insufficient consideration to the fact that McKinsey's alleged misconduct targets the federal judiciary. As a consequence, this case requires us to focus on the responsibilities that Article III courts must shoulder to ensure the integrity of the Bankruptcy Court and its processes.")*.

In consonance, RA4ARG does claim to have sufficiently alleged a monetary scheme of fraudulent nature before US courts, one in which both the Argentinean people and the US legal system –the United States of America– are victims therefrom. As previously advocated by RA4ARG, the so far concept of finality cannot overtrump the consummation of fraud by Court decree eventually propelling highly damaging judicial policy-making worldwide, all of which goes

63

way beyond an eventual judicial error under the constitutionally limited jurisdiction of federal courts under current law.[23]

It is worth remembering that the Eskenazi Family undercapitalized the Petersen Group –Spanish and Australian off-shore vehicles to acquire shares of YPF SA–; paid roughly $3.7 billions for a 25% stake in YPF SA without spending a single cent of its own equity –loans vastly paid-off with past and future illegal dividends of YPF SA, the target company–; reached the CEO and other board positions at YPF SA; commingled assets as collateral; incurred all sort of irregularities leading to alleged money laundering; "voluntarily" filed for bankruptcy of such investment vehicles in Spain, after agreeing on this jurisdiction with Repsol SA from Spain and the Kirchner Family; and projected the final scheme towards consummating fraud on the Court via a $16.1 billion award, without any prior losses of any kind but already hefty financial benefits (App. L at A-239).

Therefore, aspiring to pierce such corporate veil in the context of alleged fraudulent activity before the US legal system is not something unreasonable, needless to say via an official criminal investigation by the Department of Justice (DOJ) and other relevant agencies, as pleaded by RA4ARG. The requirements for

---

[23] Ludovici, Stephen E., "Rule 60(b)(4): When the Courts of Limited Jurisdiction Yield to Finality", *66 Fla. L. Rev. 881* (2015).

such a measure are fully guaranteed in this case, including the one of dominance in a reverse piercing the veil scenario. See *Citibank, N.A. v. Aralpa Holdings Limited Partnership et al*, No. 1:2022cv08842 - Document 116 (S.D.N.Y. 2024); Docket No. 24-423-cv, United States Court of Appeals, Second Circuit (January 24, 2025); *Passalacqua Builders, Inc. v. Resnick Devs. S., Inc.*, 933 F.2d 131 (2d Cir. 1991); *Sweeney, Cohn, Stahl & Vaccaro v. Kane*, 773 N.Y.S.2d 420 (2d Dep't 2004); among others.

Moreover, in connection with any agreements between the Petersen Group –controlled by the Eskenazi Family– and Burford Capital Ltd. –Prospect or any other vehicle alluded on record– by which the latter propelled this lawsuit, it is proper to invoke within this overall setting the eventual clawing back of voidable and fraudulent transactions impacting US legal proceedings.

All of it, as a result of an eventual intent to defraud, after preferential and noncommercial transactions in the midst of "voluntary" Spanish bankruptcy proceedings for an uncertain amount, which –as reported– would have been monetized to undisclosed third-parties at a discount. See *Irving. H. Picard, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC*, 917 F. 3d 85 (CA2 2019) (transfers made at the US level and/or out of US sources –legal proceedings– are deemed "domestic activity", irrespective of where the initial or subsequent transferee is located; there is no presumption against

65

extraterritoriality and international comity principles limiting the scope by which the trustee of a domestic debtor cannot recover property that the debtor transferred to a foreign entity that subsequently transferred it to another foreign entity).

In the end, it would be unfathomable to allow foreign State-related corruption to succeed in US courts at unprecedented levels by any standards, when such sort of corruption is the source of multiple evils around the world;[24] including but not limited to: the upended scale of human values, enthroning and rewarding inherently flawed individuals at the helm of human activities; the dissemination of wars under the fake banner of ideology; the reproduction of famine, poverty, crime, lack of education, addictions, and massive migration flows; the enlargement of the State-platform and its consequential reduction of private-fueled enterprises –only successful if favored by corrupt State-officers–; and other similar implications coming from such a disease.

It is just and fair to request this Court not to allow a US landmark precedent with global reach sealing any of the prior. Foreign markets traditionally fly to the US currency as a safe-heaven, but they do so out of commanding laws. This intangible cannot be put at risk via harmful legal precedents.

---

[24] Gupta, S., Davoodi, H. & Alonso-Terme, R., "Does corruption affect income inequality and poverty?". *Econ Gov* 3 (2002), pp. 23–45.

### e. *Final considerations*

As a corollary, the following final considerations of fact and law can be extracted:

- Although the Republic of Argentina is not the Federal Republic of Germany –considering the historical weight of a developed nation of such caliber versus a developing one in the so-called third-world–, the first one deserves the same deference and consideration as the second one insofar the comity principle. See *Republic of Germany v. Philipp*, 592 U.S. ___ (2021).

- This case is about State-related corruption causing horrific damage on the Argentinean population, never foreign claims related to the Nazi regime afflicting the Jewish people and other victims of unspeakable crimes.

- Based on ongoing and potential new criminal proceedings, the possibility of unnecessarily pitting two sovereign legal systems is patent and with uncertain ramifications to all of those involved in the alleged criminal activity.

- Alleged State-corruption from abroad, as opposed to US-centered criminal activity from inception, might have facilitated the masquerading of these legal proceedings as an honest dispute of private law between two truly distinct and opposite parties, when in fact the individuals behind both the Plaintiffs and Defendants were on the same side from the beginning –thus coercing or influencing the judicial machinery to favor the Plaintiffs in an egregious setting and manifestly unjust outcome.

- RA4ARG's intervention as of right and permissive, as an interested-party, is timely attending its request for relief per Rule 60(b)(4)(6) and (d)(1)—(3). No other party has advocated RA4ARG's distinctive arguments and defenses requiring a final judgment from the District Court.

- Claims tainted by the "color" of foreign-government corruption cannot surpass the threshold imposed by FSIA, or promote and facilitate via *stare decisis* the occurrence of further State-driven corruption in foreign

67

governments with the capacity to obtain stratospheric monetary rewards via US courts. As a sovereign nation, the Republic of Argentina is immune to the Plaintiffs' action in these legal proceedings.

- The $16.1 billion plus award against the Republic of Argentina is manifestly unjust, calling for the timely and extraordinary remedy foreseen by Rule 60. Its vacatur is fair and equitable under applicable law, including the national and strategic interests of the United States of America.

## CONCLUSION

For all reasons stated above, RA4ARG respectfully requests that this Court:

**(i)** reverse the District Court's denial of this party's intervention as of right and permissive in these legal proceedings pursuant to Rule 24(a)(b);

**(ii)** order a criminal investigation by the Department of Justice (DOJ) and all relevant agencies as to the facts and parties previously highlighted in these legal proceedings, already consented twice by the Republic of Argentina on the head of President Javier Milei; and

**(iii)** remand the case to the District Court for the vacatur of its $16.1 billion award plus against the Republic of Argentina and in favor of the Plaintiffs pursuant to Rule 60(b)(4)(6) and (d)(1)—(3), Rule 62.1(A)(3)(B)(C), FRAP Rule 12.1.

Dated:  May 5, 2025.


By:  Fernando G. IRAZU
Attorney at Law
President
***Republican Action for Argentina, Inc.***
Billinghurst 1656
Buenos Aires, 1425
ARGENTINA
fgirazu@gmail.com
+54811-3084-8080

*Counsel for RA4ARG*

# ADDENDUM

The following applicable Rules have particular relevance to the present Brief:

**Rule 24. Intervention.**

"**(a) INTERVENTION OF RIGHT**.

On timely motion, the court must permit anyone to intervene who: (1) is given an unconditional right to intervene by a federal statute; or (2) claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

**(b) PERMISSIVE INTERVENTION**.

(1) In General. On timely motion, the court may permit anyone to intervene who: (A) is given a conditional right to intervene by a federal statute; or (B) has a claim or defense that shares with the main action a common question of law or fact.
(2) By a Government Officer or Agency. On timely motion, the court may permit a federal or state governmental officer or agency to intervene if a party's claim or defense is based on: (A) a statute or executive order administered by the officer or agency; or (B) any regulation, order, requirement, or agreement issued or made under the statute or executive order.
(3) Delay or Prejudice. In exercising its discretion, the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights.

**(c) NOTICE AND PLEADING REQUIRED**.

A motion to intervene must be served on the parties as provided in Rule 5. The motion must state the grounds for intervention and be

70

accompanied by a pleading that sets out the claim or defense for which intervention is sought."

**Rule 60.  Relief from a Judgment or Order.**

"(a) *CORRECTIONS BASED ON CLERICAL MISTAKES; OVERSIGHTS AND OMISSIONS.* The court may correct a clerical mistake or a mistake arising from oversight or omission whenever one is found in a judgment, order, or other part of the record. The court may do so  on motion or on its own, with or without notice. But after an appeal has been docketed in the appellate court and while it is pending, such a mistake may be corrected only with the appellate court's leave.

**(b) *GROUNDS FOR RELIEF FROM A FINAL JUDGMENT, ORDER, OR PROCEEDING.* On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons**: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party; (4) the judgment is void; (5) the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or **(6) any other reason that justifies relief**.

**(c) *TIMING AND EFFECT OF THE MOTION*.** (1) Timing. **A motion under Rule 60(b) must be made within a reasonable time**—and for reasons (1), (2), and (3) no more than a year after the entry of the judgment or order or the date of the proceeding.
(2) Effect on Finality. The motion does not affect the judgment's finality or suspend its operation.

**(d) *OTHER POWERS TO GRANT RELIEF*. This rule does not limit a court's power to: (1) entertain an independent action to relieve a party from a judgment, order, or proceeding;** (2) grant relief under 28 U.S.C. § 1655 to a defendant who was not personally

notified of the action; or **(3) set aside a judgment for fraud on the court**…"

**FRAP, Rule 12.1. Remand After an Indicative Ruling by the District Court on a Motion for Relief That Is Barred by a Pending Appeal**.

(a) *Notice to the Court of Appeals*. If a timely motion is made in the district court for relief that it lacks authority to grant because of an appeal that has been docketed and is pending, the movant must promptly notify the circuit clerk if the district court states either that it would grant the motion or that the motion raises a substantial issue.

(b) *Remand After an Indicative Ruling*. If the district court states that it would grant the motion or that the motion raises a substantial issue, the court of appeals may remand for further proceedings but retains jurisdiction unless it expressly dismisses the appeal. If the court of appeals remands but retains jurisdiction, the parties must promptly notify the circuit clerk when the district court has decided the motion on remand.

**Rule 62.1. Indicative Ruling on a Motion for Relief That is Barred by a Pending Appeal.**

(a) *RELIEF PENDING APPEAL*. If a timely motion is made for relief that the court lacks authority to grant because of an appeal that has been docketed and is pending, the court may:

(1) defer considering the motion;
(2) deny the motion; or
(3) state either that it would grant the motion if the court of appeals remands for that purpose or that the motion raises a substantial issue.

(b) *NOTICE TO THE COURT OF APPEALS*. The movant must promptly notify the circuit clerk under Federal Rule of Appellate Procedure 12.1 if the district court states that it would grant the motion or that the motion raises a substantial issue.

(c) *REMAND*. The district court may decide the motion if the court of appeals remands for that purpose.

72

## CERTIFICATION

I hereby certify that this Brief complies with FRAP, Rule 32(a)(7)(B) (Local Rule 32.1.(a)(4)(A)) because it contains 13,970 words, excluding the portions of the brief exempted by Rule 32(f), according to the count of Microsoft Word.

I further certify that this brief complies with the typeface and type-style requirements of FRAP, Rule 32(a)(5)-(6) because it is printed in a proportionally spaced 14-point font, Serif.

Dated:  May 5, 2025.

By:  Fernando G. IRAZU
Attorney at Law
President
***Republican Action for Argentina, Inc.***
Billinghurst 1656
Buenos Aires, 1425
ARGENTINA
fgirazu@gmail.com
+54811-3084-8080

*Counsel for RA4ARG*

**CERTIFICATE OF SERVICE**

On May 5, 2025, I filed and served the foregoing Brief for the Interested

Party - Appellant, Republican Action for Argentina, Inc., via the Court's ACM

electronic-filing system.

Dated:  May 5, 2025.

_____

By:   Fernando G. IRAZU
      Attorney at Law
      President
      ***Republican Action for Argentina, Inc.***
      Billinghurst 1656
      Buenos Aires, 1425
      ARGENTINA
      fgirazu@gmail.com
      +54811-3084-8080

      *Counsel for RA4ARG*

74

75

\* \* \*